IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| E.F., a minor, by and through, LAQUARBASHAUN FORD, his mother,<br><br>    Plaintiff,<br><br>v.<br><br>TROUP COUNTY SCHOOL SYSTEM, DAVID SHUMATE, in his individual and official capacity, and ALTON WHITE, in his individual and official capacity,<br><br>    Defendants. | CIVIL ACTION<br><br>NO._____ |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff E.F., by and through his mother, Laquarbashaun Ford, respectfully submits this Memorandum of Law in Support of his Motion for Preliminary Injunction. Defendants violated E.F.'s constitutional rights based solely on his speech and expressive conduct. E.F. made a music video that has nothing to do with Defendants or school operations. Defendants punished E.F. for making the music video.

## I. FACTUAL BACKGROUND

E.F. is a seventeen-year-old African-American male with ambitions to become a successful music artist. (*E.F. Decl.* ¶¶ 1, 3; *Ford Decl.* ¶¶ 4-5). He draws inspiration for his songs from his life experiences and expresses them in an artistic form called rap music. E.F.'s songs express a range of topics and emotions. (*E.F. Decl.* ¶¶ 10-13). E.F. performs under the stage name, "Badazz Bastard," and the lyrics of his songs are performed and recorded "from [his] heart" in an ad lib form called "freestyle," without preconceived lyrics or rehearsal. (*Id.* ¶ 7). When E.F. records a song or makes a music video, he shares it on social media to promote his music and build his fan base. (*Id.* ¶ 9). Listeners to E.F.'s music do not always understand the meaning behind his songs, and sometimes listeners interpret his songs to mean that he is a bad person. (*Id.* ¶ 13).

E.F., or sometimes his mother, pays an individual named Orlando Cochran ("Mr. Cochran") to produce his music videos. (*Id.* ¶ 8; *Ford Decl.* ¶ 8). In or around late June or early July 2019, Mr. Cochran produced a music video for E.F.'s song, "Consequences 2." (Badazz Bastard and OTG Spazz, *Consequences 2*, attached as **Exhibit 1** (hereinafter "the music video")). Mr. Cochran provided props used in the music video, including prop guns made of plastic that do not fire. (*E.F. Decl.* ¶ 16; *Ford Decl.* ¶ 10). The prop guns symbolized protection in the music video, and E.F.

returned the props to Mr. Cochran after the filming of the music video. (*E.F. Decl.* ¶ 16).

In the music video, E.F. expresses several dance moves, including shaping a "N" with his hand to represent "Northside," LaGrange, the location where he grew up and where the music video was filmed. (*E.F. Decl.* ¶ 15, 19). He also makes a gesture across his nose, which is a popular gesture among kids known as "slime." (*Id.* ¶ 19). The music video was made off-campus during non-school hours and makes no mention of E.F.'s school or any individuals associated with his school. (**Ex. 1**). Approximately two weeks later, E.F. uploaded his music video to the video sharing website, YouTube. At the time the music video was uploaded, E.F. was attending summer school at LaGrange High School ("LHS"). E.F. never brought the music video to school or showed anyone the music video at school. (*E.F. Decl.* ¶ 23).

On or around July 15, 2019, an administrator with LaGrange High School ("LHS") in the Troup County School System ("TCSS") found the music video and brought it to the attention of school officials and law enforcement. On August 12, 2019, on E.F.'s first day of class after summer break, Defendant Alton White ("Principal White") suspended E.F. pending a discipline tribunal. (*Id.* ¶¶ 26-27).

Based on "handshakes and signs," in the music video, Principal White charged E.F. with Section 7.10 of TCSS policy, "Participation in Gang Activity":

> No student shall actively participate in any street gang with knowledge that its members engage in or have engaged in a pattern of gang activity and who willfully promotes, furthers, or assists in any criminal conduct or violation of school rules, or represents himself or herself as being a gang member.

Based on "handshakes and signs" and the "possession of a handgun," Principal White also charged E.F. with Section 12.08 of TCSS policy, "Outside Conduct":

> A student who commits any act or exhibits conduct outside of school hours or away from school which may adversely affect the educational process or endanger the health, property, safety, morals, or well-being of other students, teachers, or employees within the school system.

(*Hearing Notice and Charge Letter*, dated Sept. 3, 2019, attached as **Exhibit 2** (hereinafter "the charge letter")). On September 4, 2019, a disciplinary tribunal hearing was held. Based on E.F.'s music video, the hearing tribunal found that E.F. violated Sections 7.10 and 12.08. E.F. was expelled without educational services for the first semester of the 2019-2020 school year; then he must complete the second semester of his 2019-2020 expulsion at TCSS's alternative school, HOPE Academy. (*Decision of Disciplinary Hearing Tribunal*, dated Sept. 4, 2019, attached as **Exhibit 3**). On appeal, the Troup County Board of Education ("Local Board") upheld the tribunal decision "in all aspects." (*Decision of Troup County Board of Education*, dated Sept. 24, 2019, attached as **Exhibit 4**).

When E.F. heard the tribunal's decision, he "blacked out" and felt "suicidal." (*E.F. Decl.* ¶ 29). E.F. loves expressing himself through rapping and has invested a lot of time and money into making his music. Likewise, E.F. has worked hard to stay on track to graduate high school on time with his class. (*Id.* ¶ 30-33). Currently, E.F. is getting no schooling, and his mother cannot afford the tuition and fees required to enroll him in private school. (*Ford Decl.* ¶ 22). E.F. feels that he "shouldn't put out more music," which makes him "feel sad to not be making music." (*E.F. Decl.* ¶ 30-31).

E.F. has never been in a gang and does not have access to a real firearm. (*Id.* ¶¶ 17, 20; *Ford Decl.* ¶ 21). "E.F. is an artist." (*Ford Decl.* ¶ 4).

## II. ARGUMENT

Courts consider four requisites in determining whether to grant a preliminary injunction. The movant must clearly establish the burden of persuasion by demonstrating: (1) substantial likelihood of success on the merits; (2) that irreparable injury will occur without an injunction; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) the injunction would not be adverse to the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002).

1. <u>Plaintiff can demonstrate a substantial likelihood of success on the merits.</u>

Plaintiff shows that Defendants violated E.F.'s First Amendment right to free speech by punishing him for a music video that was made off-campus while school was not in session, created no actual or foreseeable disturbance, and makes no mention or reference to school whatsoever. Defendants have no legal justification for violating E.F.'s clearly established constitutional right to free speech.

The Free Speech Clause of the First Amendment states, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. The First Amendment, as incorporated though the Due Process Clause of the Fourteenth Amendment, applies to Defendants. *See Holloman v. Harland*, 370 F.3d 1252, 1268 (11th Cir. 2004) "The Constitution guarantees students (and all people) the right to engage not only in 'pure speech,' but 'expressive conduct,' as well." *Id*. at 1270. (holding that "pure speech" and "expressive conduct" are assessed the same).

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the "constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 551 U.S. 393, 396-97 (2007). A student's speech may be regulated if it "materially disrupts classwork or involves substantial disorder or

invasion of the rights of others," or the student's speech "might reasonably have led school authorities to forecast substantial disruption or material interference with school activities." *Tinker*, 393 U.S. at 513-14 (holding that the wearing of armbands by students in the classroom did not cause a substantial disruption, and thus, was protected speech).

School officials do not have unfettered jurisdiction to regulate the speech of a student anywhere he or she goes. Courts recognize that it "would be unseemly and dangerous precedent to allow the state in the guise of school authorities to reach into a child's home and control his/her actions there to the same extent that they can control that child when he/she participates in school sponsored activities." *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 216 (3d Cir. 2011). When "school officials have ventured out of the school yard and into the general community where the freedom accorded expression is at its zenith, their actions must be evaluated by the principles that bind government officials in the public arena." *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1050 (2d Cir. 1979). However, the *Tinker* standard does apply for off-campus student speech, "if the speech raises on-campus concerns." *Evans v. Bayer*, 684 F. Supp. 2d 1365, 1370 (S.D. Fla. 2010); *see also Morse*, 551 U.S. at 400-01; *Doe v. Valencia Coll.*, 903 F.3d 1220, 1231 (11th Cir. 2018).

"*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Bell v. Itawamba Cnty. Sch. Bd*, 799 F.3d. 379, 397 (5th Cir. 2015) (citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001)). "School officials must be able to show that their actions were caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular view." *See Tinker*, 393 U.S. at 509; *see also J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011). The "government may not prohibit student speech based solely upon the emotive impact that its offensive content may have on the listener." *Layshock v. Hermitage Sch. Dist.*, 684 F. Supp. 2d 587, 597 (W.D. Pa. 2007), *aff'd,* 650 F.3d 205 (3d Cir. 2011).

Here, there is no nexus between the music video and the school. E.F. was expelled for making a music video. (**Ex. 3**). The music video was shot off-campus and over summer break. (*Verified Compl.* ¶¶ 23, 29; *E.F. Decl.* ¶ 15). E.F.'s music video does not reference any students, administrators or the school in any way. (**Ex. 1**). E.F. never brought the music video to school and did not intend for it to reach the school. (*E.F. Decl.* ¶ 23). There is no evidence that any other student could, or did, discover the music video at school. (*Verified Comp.* ¶¶ 51-53; *Id.* ¶¶ 23-24). But for Defendants' actions, there is no reasonable indication that E.F.'s music video would have reached the school. (*Verified Compl.* ¶¶ 40-42, 53-55). Defendants do not have

jurisdiction to punish E.F. based on the music video. *See Morse*, 551 U.S. at 405 ("Had [the student] delivered the same speech in a public forum outside the school context, it would have been protected.") (referring to *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986)); *Layshock*, 650 F.3d at 216; *Evans*, 684 F. Supp. 2d at 1370.

Courts that have allowed school officials to regulate off-campus student speech all recognize a nexus between the off-campus speech and the school. *See e.g.*, *Morse*, 551 U.S. 393 (student speech at school-sponsored event); *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018) (student speech impinged upon the rights of another student); *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379 (5th Cir. 2015) (student speech threatened violence against two named coaches and was intended to reach the school setting); *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062 (9th Cir. 2013) (student speech involved violent and threatening messages to friends about planning a school shooting) ("Given the subject and addressees of [the student's] messages, it is hard to imagine how their nexus to the school could have been more direct."); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978 (11th Cir. 2007) (student speech involved poem brought to school and describing the student shooting her sixth period teacher). However, E.F.'s speech has no connection to the school, students, or administrators in any way.

Assuming *arguendo* that E.F.'s speech has some sufficient connection to the school, Defendants do not have justification under *Tinker* to punish E.F. because his speech did not cause a substantial or material disruption, nor are there facts "which might reasonably have led school authorities to forecast substantial disruption or material interference with school activities." *See Tinker*, 393 U.S. at 513-14. Defendants did not even allege that E.F.'s speech might cause a disruption. (**Exs. 2-4**); Defendants allowed E.F. to finish his summer school at LHS at least two weeks after discovering the video. (*E.F. Decl.* ¶ 25). Prior to the start of the semester, school administrators told E.F.'s mom that they were "looking forward to seeing him on campus." (*Ford Decl.* ¶ 11). The music video is still on YouTube, and there still is no disturbance. (*Verified Compl.* ¶ 55). "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Bell*, 799 F.3d. at 397 (citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001)). Here, there is not even a remote apprehension of disturbance. Thus, Defendants are not justified in punishing E.F. for exercising his constitutional right to free speech.

Finally, E.F. did not impinge on another student's or school staff's rights. Last year, the Eleventh Circuit held that under *Tinker*, a student may be disciplined for off-campus, non-school related speech if the student's speech "impinge[s] upon the

rights of other students." *Valencia Coll.*, 903 F.3d at 1229 (quoting *Tinker*, 393 U.S. at 509). As previously stated, no other student, teacher, administrator, or other individual, has had their rights impinged because of E.F.'s music video.

E.F. has an undeniable and absolute right to express himself through music when it has no bearing on the school or the rights of any other individual. There is no justification for Defendants to punish E.F. based on his speech. E.F. shows that he has a substantial likelihood of success on the merits. *See Johnson & Johnson Vision Care, Inc.*, 299 F.3d 1242, 1246-47.

2. <u>Defendants' actions are causing irreparable harm to E.F., and a preliminary injunction is necessary to prevent greater future harm.</u>

"[It] is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). First Amendment rights are stringently protected due to "fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). Actual chilling of speech is not required to show irreparable harm, rather the "source of that chill…provides the critical irreparable injury to those citizens, regardless of whether actual chill was proved." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). A violation of

the First Amendment warrants injunctive relief because "chilled free speech" cannot be compensated by money damages, due to the First Amendment's "intangible nature." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

E.F. has been penalized for exercising his First Amendment right to free speech. (**Exs. 2-4**). Defendants' actions have caused a chilling effect on E.F. that has deterred him from making any more music. (*E.F. Decl.* ¶¶ 30-31) ("But going through all this has made me feel like I shouldn't do it anymore, because it just cause me more problems and get me into trouble."). Defendants' violations have caused E.F. irreparable harm, and without a preliminary injunction, E.F. will suffer greater future harm. *See Cate*, 707 F.2d at 1188 ("[D]irect penalization, as opposed to incidental inhibition, of First Amendment rights constitutes irreparable injury.").

Further, denial of access to the classroom and all the social and educational benefits associated with such access constitutes ongoing irreparable harm for which neither a monetary award or prevailing on the merits can compensate. *Ray v. Sch. Dist.*, 666 F. Supp. 1524, 1535 (M.D. Fla. 1987); *see also Cox v. Brown*, 498 F. Supp. 823, 828-29 (D.D.C. 1980). Interference with the educational rights of children is not harm that can be compensated by monetary damages, "[g]iven the important role of education in our society, and the injuries that would arise from

deterring [ ] children from seeking the benefit of education." *Coalition v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012). Since August 12, 2019, E.F. has not received any educational services or credits toward graduation. (*Verified Compl.* ¶¶ 79, 82). He languishes at home and is "really bored." (*Verified Compl.* ¶ 80; *E.F. Decl.* ¶ 33). Despite previous hopes of E.F. and his mother, Defendants' actions have ensured that E.F. will not be able to graduate with his class peers on time. (*E.F. Decl.* ¶ 32-33; *Ford Decl.* ¶ 23). Defendants' violations have caused E.F. irreparable harm, and without a preliminary injunction, E.F. will suffer greater future harm. *See Holloman v. Harland*, 370 F.3d 1252, 1293 (11th Cir. 2004) ("Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions.").

3. <u>The threatened injury to E.F. outweighs any damage the proposed injunction may cause Defendants.</u>

The equities weigh heavily in E.F.'s favor for granting the preliminary injunction. An infringement of an individual's First Amendment rights, even a temporary infringement, is a serious and substantial injury. *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Education is so important in our society that when a policy deters children from attending school, the equities favor enjoining the policy. *See Hispanic Interest Coal. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012). Defendants have violated E.F.'s constitutional rights and

denied him an education. Conversely, Defendants face no damage to reenroll E.F. into school. The equities weigh in favor of granting E.F.'s request for a preliminary injunction. *See Johnson & Johnson Vision Care, Inc.*, 299 F.3d 1242, 1246-47.

4. <u>An injunction would not be adverse to the public interest</u>.

A preliminary injunction would serve the public interest because it is in the public interest to enforce First Amendment rights. *See Trussville*, 458 F.3d at 1272. The public has no interest in enforcing a school policy that may be found unconstitutional. Issuing a preliminary injunction to enforce E.F.'s constitutional rights would not be adverse to the public interest.

### III. CONCLUSION

Plaintiff E.F. has shown that he meets the requirements for a preliminary injunction. Plaintiff respectfully requests that the Court issue a preliminary injunction to enjoin Defendants from causing E.F. further irreparable harm.

The undersigned counsel hereby certifies that this brief complies with L.R. 5.1B and 7.1, and that this brief is Times New Roman font size 14 point.

Dated: October 15, 2019

Respectfully submitted,

/s/Eugene Choi
Eugene Choi, GA Bar No. 121626
Lisa J. Krisher, GA Bar No. 429762
Homero Leon, Jr. GA Bar No. 446585
Attorneys for Plaintiff

GEORGIA LEGAL SERVICES PROGRAM  
104 Marietta Street, Suite 240  
Atlanta, Georgia 30303  
Tel: (404) 563-7715 ext. 1583  
Fax: (404) 463-1584  
echoi@glsp.org